UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEIL HOWARD,<br>HEIDI HOWARD, and<br>CHRISTOPHER HOWARD, a minor<br>ETHAN HOWARD, a minor<br>JESSICA HOWARD, a minor<br>by and through their parents and<br>Next Friends Neil Howard and<br>Heidi Howard, and<br>FAITH HOWARD, deceased minor,<br>by and through the executors and<br>parents Neil Howard and Heidi Howard,<br>    Plaintiffs<br>  vs.<br><br>BARBARA MALAC,<br>PAIGE HALEY,<br>JUDY BELAND,<br>MARY ELLEN D'INTINO,<br>CYNTHIA PRESTON,<br>CYNTHIA FISHER,<br>ELIZABETH CZARNIONKA,<br>KATHERINE GRAVES,<br>NANCY GINGRAS,<br>ZEVORAH BAGNI,<br>MARGARET HAJJAR,<br>BARBARA BOUSTANI,<br>FELICIA SUGGS<br>ANNE DALE,<br>VERONICA SERRATO,<br>    Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Docket No. 02-12106 WGY |

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
OF DEFENDANT MARGARET HAJJAR**

Page -1-

Now come the plaintiffs, members of the Howard family, as named in the caption above, and oppose the Motion for Summary Judgment of Defendant Margaret Hajjar. Plaintiffs assert that there are genuine issues of material fact for trial, and she is not entitled to judgment as a matter of law, as set forth in more detail below.

In summary, Defendant Hajjar alleges that she was not a "state actor" for purposes of an action under 42 U.S.C. §1983, and is thus not liable to plaintiffs under that statute. However, Plaintiffs assert that defendant Hajjar was indeed acting as a "state actor" at all pertinent times, and in conjunction with other state actor defendants at the Massachusetts Department of Social Services, to deprive plaintiffs of their protected constitutional rights, is not protected by absolute or qualified immunity, and is liable to plaintiffs for damages arising from her actions.

## Statement of Material Facts In Dispute

**A.  Dispute of Defendant's Material Facts**

Plaintiff contests the following allegations in Defendant's statement of undisputed facts, using the paragraph numbering in Plaintiff's statement, as follows:

4. In paragraph 4, Hajjar states that an agent of Spaulding Rehabilitation Hospital called the Visiting Nurses Association, Inc./Hospice of Greater Lowell to obtain a nurse visit to the Howard home. This may be true, but that omits the implications of the Progress Notes of 10-28-99, attached as Exhibit "A" hereto, which indicate, "**DSS home visit today**."

    On Page 8 of her brief, Hajjar dismisses the significance of this note concerning a

DSS home visit, but the record indicates that it has much more importance than she admits, as an issue disputed material fact. As shown by the attached documents, only Hajjar, and not another agent of DSS, made a visit that day to the Howard home. Nor did any other agent of DSS make a visit through the entire ensuing investigation of her report. Hajjar is the only person who made such a home visit.

The record shows that after Hajjar made her child abuse report to the Massachusetts Department of Social Services (DSS) under M.G.L. Ch. 119 §51A on October 28, 1999, no agent of DSS visited the Howard home. The 51A "Child Abuse/Neglect Report", part of which is attached as Exhibit "G" of defendant's memorandum, contains no notation of a DSS visit to the Howard home. The 51B Child Abuse/Neglect Investigation, part of which is also attached as Exhibit "G" to the defendant's memorandum, also indicates no visit by a DSS agent to their home. The complete 51A report is attached as Exhibit "B" hereto, and the complete 51B report is attached as Exhibit "C" hereto. No DSS visit to their home appears in either of the complete reports, either.

Thus, the appearance of "DSS home visit today" in the Spaulding records is no mere "oblique and solitary reference", as she characterized it on Page 8 of her memorandum. It is reasonable to conclude that the notation about a DSS visit refers to Hajjar, not some other "official" DSS agent, since no one else but her went to the Howard home that day or throughout the entire investigation period. There is a substantial contradiction between her assertion that she was not working in collusion with DSS, and the implication of the Spaulding documents. Such an issue of material

fact should be sufficient to deny defendant's motion for summary judgment.

7.  Defendant Hajjar states that she "did not work and has never worked for DSS." Plaintiffs accept that she is not employed on the official payroll of DSS, but it is clear from the documents, including the whole tone of her report, that she was working in collusion with the DSS, as set forth in response to Paragraph 4, above, and explained in more detail below.

**B.  Material Facts Asserted by Plaintiffs.**

The Howards assert the following material facts, which are disputed:

1.  Mrs. Howard did not tell Ms. Hajjar that her husband abused her. See answer to interrogatory number 5 and 6, attached as Exhibit "D".

2.  Ms. Hajjar had already decided to call DSS prior to or sometime during the first visit. See Ms. Hajjar's notes, attached as Exhibit "E".

3.  Ms. Hajjar viewed her role as an adjunct of DSS, prior to her visit to the Howard home. See Exhibit "A" attached.

4.  Hajjar signed a consent form on behalf of the minor child, Faith Howard, in lieu of her parent, to allow a home visit, and did not disclose that she had done so to the parents. Exhibit "E".

**Argument**

1.   *Hajjar is a "State Actor" for Purposes of a Civil Rights Claim.*

The core issue argued in the defendant's motion is whether Hajjar is a "state actor" for purposes of an action under 42 U.S.C. §1983. Defendant states, on page 6 of her memorandum, that ". . it cannot be fairly disputed that defendant Hajjar was not a state actor". Plaintiffs do dispute that assertion, and argue that she is a state actor, not because she made a child abuse report under M.G.L. Chapter 119 §51A, but because she was working as an agent of DSS to wrongly accuse this family of abuse.

It is true, as Hajjar argues, that M.G.L. Ch. 119 §51A on its face absolves those who report abuse, of criminal and civil liability under that statute. That is lamentable to most of the families who are reported, as the large majority of claims made to DSS are false, either being screened out initially on the telephone, or determined to be false after investigation. See Exhibit "F" attached, which are statistics posted on the Massachusetts DSS web site.

Hajjar cites *Brown v. Newberger*, 291 F.3d 89 (1st Cir. 2002) for the proposition that filing such a report also creates no federal civil rights liability, as it does not make such a reporter a "state actor" under the state statute. In that cited case, the First Circuit regards the purpose of such a report to merely "signal the need for DSS to look into the matter and decide for itself whether there was a problem and what to do about it." *Brown* at 93.

She also cites *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249 (1st Cir. 1996), where Hancock Insurance Co. was not liable for making a police report about what they believed to be a crime of an ex-employee. She argues, by analogy, that just as reporting a crime does not trigger civil rights liability, neither does child abuse reporting. However, the court in *Hancock*

concluded that the police made an independent investigation, and that an independent magistrate reviewed the criminal complaint, neither being connected to John Hancock. *Roche* at 254. The court stated that, "[t]here is not the smallest hint that the magistrate was a Hancock pawn, or, for that matter, that Hancock solicited the magistrate to act. " *Roche* at 254.

By contrast, Hajjar <u>was</u> acting as a DSS "pawn", not merely a reporter. Since the Spaulding Hospital progress notes entry states that the visit by Hajjar to the Howard home was a "DSS home visit", her action appears to be entwined with that of DSS in an entirely different manner than that of a mere independent reporter or private actor.

In her answer to interrogatory number 4, Mrs. Howard details the sneaky approach used by Hajjar, coming without an appointment and little advance notice, and demanding that she be allowed entry. Nurse Hajjar had herself signed the "informed consent" form for Mrs. Howard's daughter, rather than have the parent sign it, wrongly stated that no parental signature was available, and did not show that or any other paperwork to Mrs. Howard, despite her asking. See "Informed consent form" part of Exhibit "E", signed by Ms. Hajjar.

Hajjar's narrative about her visit to the Howard's home, in her notes, (attached as Exhibit "E), differs substantially from Mrs. Howard's version of that visit, as set forth in Responses Four and Five to her answers to interrogatories. (Attached as Exhibit "D"). In Mrs. Howard's answer to Interrogatory Number 6, she specifically denies telling Hajjar that her husband was abusive, which, if true, would have eliminated the trigger for a report under Section 51A.

The only common theme in both Hajjar's and Mrs. Howard's narratives is that, sometime either before or during the visit, Hajjar had determined to get the DSS involved.. She may claim that it was as a result of the home inspection. However, if she was sent out to get some "dirt" on

the family for DSS, as the Spaulding record and her subsequent report seem to indicate, then she might have found that "dirt"anyway, even if she had to make it up. The DSS's own statistics set forth in Exhibit "F" are the proof that DSS can readily be used to "get" someone. There are plenty of possible motives on the part of Spaulding to get DSS involved, including using it to keep the critically ill child Faith Howard from going home to her parents, and thus not losing the substantial profit that such a child brings to such an institution.

The Howard's house was being remodeled at the time that Hajjar visited. While she comments at some length about messiness in her report, she makes little allowance for how disruptive such a repair job can be to a household. Remodeling is hardly an indicia of abuse or neglect under any definition used by DSS. See 110 Code Mass. Reg. 2.00. However, once Hajjar had transmitted the child abuse report to DSS, the condition of their home was transformed into being the "worst" the reporter [Hajjar] had "ever seen," wrought with superlatives and hyperbolic details not in Hajjar's already inaccurate VNA report. See 51A and 51B, attached as Exhibit "B" and "C".

The most plausible explanation for the wide gulf between what Mrs. Howard claims, what Ms. Hajjar claims that Mrs. Howard claims, and what DSS claims that Ms. Hajjar claims, is that Hajjar and DSS were working in collusion, not in an arm's length reporting relationship.

The crux of the "state actor" analysis is stated succinctly as follows: "It is the [worker's] function within the state system, not the precise terms of her employment, that determines whether h[er] actions can fairly be attributed to the state. *Frazier v. Bailey*, 957 F.2d 920, 928 (1st Cir. 1992), citing *West v. Atkins*, 487 U.S. 42, 55-56, 101 L. Ed. 2d 40 , 108 S. Ct. 2250

(1988). If Hajjar acted under "color of law", it does not matter whether she was directly employed by DSS, or was merely acting as its designated agent. The issue turns on the relationship of the private party to the government. If the private party conspires with the government agent, i.e., DSS worker, then she can be liable. See *Dennis v. Sparks*, 449 U.S. 24 (1980).

In summary, while Hajjar claims that she was merely making a child abuse report under the Massachusetts mandatory reporter child abuse statute, the records indicate a good possibility that something else was going on. Rather, she appeared to serve as the eyes and ears of DSS, and for Spaulding's ultimate purpose of securing a good reason to not send Faith Howard home, with the accompanying loss of fees for her care. There is material evidence to support a completely different motive for Hajjar making a child abuse report against the Howards, as well as evidence to show her alliance with state actors at DSS.

This is manifest in the Spaulding notes, Hajjar's notes, Mrs. Howard's answers to interrogatories, and the DSS reports derived therefrom. The record reveals a substantial disagreement about the most important and fundamental issue of material fact vis-a-vis this defendant - whether she was working as part of a DSS/Spaulding cabal, and thus became a state actor for purposes of this suit. This constitutes a dispute of material fact which must be decided by a factfinder, and thus the defendant's motion should be denied.

**2.**     *Hajjar Is Not Absolutely Immune From Liability For Howards' Civil Rights Claim.*

The second argument propounded by Hajjar asserts that she is absolutely immune from liability under the Massachusetts mandated reporting law (M.G.L. Ch. 119 §51A), and thus

entitled to judgment as a matter of law. Hajjar's memorandum cites an impressive litany of cases where these so-called "mandated reporters", i.e. those who are required to report child abuse under that statute, are absolutely immune from civil rights liability.

The immunity she argues for here does not derive from the question of whether she is a state actor, as above, but is premised on the status of "mandated reporter". In the alternative, she argues that she made a "good faith" report to the DSS concerning Faith Howard, and thus has qualified immunity. Def. Memo P. 11. She states that she had no ulterior motive or malevolent design in making her report. (Def. Memo P. 12), and is thus protected by that law's immunity provision.

### A.   Mandated Reporter Immunity

Hajjar's absolute immunity argument is based on statutory immunity found in the Massachusetts mandated reporter statute, at Ch. 119 §51A. It states that, "No person so required to report shall be liable in any civil or criminal action by reason of such report." Hajjar is indeed a mandated reporter under the terms of that law, and the statute is unambiguous that such a mandated reporter shall not be liable. The cases cited in her memo interpret this statute in its plain meaning. See e.g. *Hope v. Landau*, 21 Mass. App. Ct. 240 (1985).

The public policy reason expressed in the *Hope* case is:

> The Legislature, thus, has stated clearly its intent to place greater importance on the protection of children than on the right to be protected against the disclosure of confidential information. The writer of a report is immune from liability regardless of the correctness of his belief as to the child's injuries or their cause. Even the absence of good faith in making a report is immaterial to liability so long as the report is one which is mandatory under the statute.        *Hope* at 243.

The legislature has thus placed "disclosure" above confidentiality, for the sake of the safety of children . But, did it intend to place "disclosure" above truth? If so, how then does the law protect these same children from false claims, as the trauma of removal of children from families is always devastating, and often results in more abuse than the parents are alleged to have perpetrated, as in the instant case? Did the legislature anticipate the trauma to children caused by false reporting, and balance that against the need for protection? Did it anticipate the unintended consequences of the impingement on the well being of children illustrated by the figures in Exhibit "F", where the majority of complaints are false, and many of the ones in the "true" column are also false? This statute is at war with itself, and accomplishes precisely the opposite of its intent in MOST cases, by their own statistics. In giving immunity to encourage reporting, it completely lost accountability. Its goal is thus grossly thwarted.

Further, why is immunity granted to those who are involved in this type of abuse, protecting those who report, rather than protecting those the statute was allegedly meant to protect, that is, the children? A statute which gives immunity to reporters in order to stanch abuse of children, should not be used as a curtain to hide behind when the actions of these same reporters result in the very abuse and deprivation of protected rights it is meant to stop.

The Court may recoil at the above as a "political" argument, and so it is. However, a constitutional liberty interest has also been jeopardized by the legislature's folly in failing to protect the children from false reporting. The removal of a child from a home invokes a liberty interest, that is, the constitutionally protected right of the parents to the care and custody of their child, and the right of the children to be with their parents. This statute invades that protected interest, and is thus unconstitutional on its face, and should be stricken.

The United States Supreme Court has repeatedly affirmed the basic right of parents to direct the upbringing of their children.[1] In its most recent opinion on the matter, in *Troxel v. Granville*, 530 U.S. 57 (2000), the U.S. Supreme Court rehearsed its long history of cases (the ones cited in footnote 1, and many others) affirming the right of parents to direct the upbringing of their children, and asserted that "it cannot be doubted that the due process clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children." *Troxel* at 66.

This entire state reporting scheme, with its immunities designed to encourage reporting, but which more often bring harm to children, qualifies as a stark example of a law crying out for review and correction, as it involves issues of grave public policy significance. The child protection industry cannot claim to be interested in protecting children, when protecting

---

[1] See, e.g. *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) ("The Fourteenth Amendment guarantees the right of the individual . . . to establish a home and bring up children"); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925) ("the liberty of parents and guardians to direct the upbringing and education of children . . . . The child is not the mere creature of the state; those who nurture him and direct his destiny have the right and the high duty, to recognize and prepare him for additional obligations"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder"); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The rights to conceive and to raise one's children have been deemed 'essential'"); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("This case involves the fundamental interest of parents, as contrasted with that of the state, to guide the religious future and education of their children . . . . This primary role of the parents in the upbringing of their children is now established beyond debate"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("freedom of personal choice in matters of family life is a fundamental liberty interest protected by the 14th Amendment")*; Hodgson v. Minnesota,* 497 U.S. 417, 447 (1990) ("We have long held that there exists a 'private realm of family life which the state cannot enter'").

reporters seems to be the more important agenda.

In all other family related proceedings, such as divorce, guardianship, and the like, the Supreme Court has set up a barrier against state interference, in that parental choices may not even be reviewed by the government to determine a child's best interest absent a prior finding that the parent is at fault or has defaulted in some manner. This was stated clearly in *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978):

> We have little doubt that the Due Process Clause would be offended "[if] a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." Smith v. Organization of Foster Families, 431 U.S. 816, 862-863 (1977) (STEWART, J., concurring in judgment).

However, breaking up families is exactly what this reporting statute does . Hajjar's actions were the precipitating factor causing the Howard family to be broken up for two years . In *Parham v. J.R.*, 442 U.S. 584, 604 (1979), the Supreme Court stated: "[A]bsent a finding of neglect or abuse. . . the traditional presumption that the parents act in the best interests of their child should apply." The reporting statute assumes the existence of abuse, before any reasonable inquiry is launched with the protections of due process, and allows reporters to hide behind it.

The Massachusetts Supreme Judicial Court has also recently addressed the same basic issues as in *Troxel*, affirming the principles in that case, (which dealt with the right of a grandparent to force visitation with the grandchild over the objection of a fit parent). See *Blixt v. Blixt*, 437 Mass. 649 (2002). The court held that there must be unfitness before the state can overrule parental care of a child. The reporter statute has no such barrier to state interference.

Courts routinely give wide latitude to the "expertise" of the Department of Social

Services, and other agencies charged with social work[2], but such deference is not supportable in fact, or the real world experience of families like the Howards, or the attorneys who deal with these cases. Such an affirmation of an agency's competence does not appear to be rooted in evidence. Counsel knows of no case which can be cited to support the assertion that DSS is worthy of such confidence as a matter of public policy, as no case alludes to any factual studies proving its competence. In fact, their actions often lead to death and injury of children.

In real life, the consequences of filing child abuse reports to DSS are rarely so benign as the First Circuit makes it sound, while writing in the abstract, in the cases cited in Hajjar's memorandum. The plaintiffs' complaint in this matter, and the answers to Mrs. Howard's interrogatories, reveal the grim facts of how the Howard children were not protected, but abused by DSS. After the report by Hajjar to DSS, and the subsequent removal of the Howard's children as a result of that report, the family struggled for two years to get them back.

This statute, granting absolute immunity, does not respect the more fundamental constitutional right of parents and children to be free of state interference, without due process. Its immunity provision should be stricken as unconstitutional on its face, and Hajjar should be held liable for her actions.

B.      Good Faith Immunity

Hajjar claims that she made a "good faith" child abuse report under M.G.L. Ch. 119 §51A, and is thus protected by qualified immunity. However, the Howards have alleged that she

---

[2] See, *e.g. Cobble v. Comm'n of the Dep't of Social Servs.,* 430 Mass. 385 *(1999); Flint v. Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992).

acted in bad faith. Howard's assertion of bad faith on the part of Hajjar is supported by the facts in the record showing that Hajjar made no appointment to come to the Howard's home, but insisted she come immediately, that she demanded to be let in over Mrs. Howard's objection, that she wrongly signed a release to approve the visit on behalf of their daughter Faith, and withheld it, that she wrongly accused Mr. Howard of abuse, that she failed to give Mrs. Howard any paper work despite her request, that she shaded the truth in her report about the remodeling going on, but downgraded them for it, that she made hysterical reports to DSS about the family, that she made a decision to file a 51A report prior to or during the visit, when she had not even seen the children. See Heidi Howard answers to Interrogatories 4-6. These are not the actions of one who is trying to make an objective assessment, but one with an arguably bad motive.

Hajjar' memorandum cites several cases to support the proposition that immunity lies unless there is "dishonest purpose", or "motive of interest" or "ill will". See *McCabe v. City of Lynn,* 875 F. Supp 53 (D. Mass. 1995). Hajjar rejects the allegation that she used a "ruse" (Def. Memo P. 12) or that she had an "ulterior motive, malice, or malevolent design." *Id.* However, a bad motive and purpose is precisely what Howards discerned at the time, and confirmed later when the record became available, claim in their complaint, and assert now.

Inasmuch as there is a substantial disagreement on this material fact, judgment cannot issue as a matter of law, but it must go to the factfinder to determine whether indeed her actions were undertaken in good faith, or as part of a scheme to assist DSS and Spaulding with a financially rewarding agenda. .

**3.    *Hajjar Does Not Have Qualified Immunity Against Liability for Howards' Civil Rights Claims.***

Lastly, Hajjar argues that, even if she is construed to be a state actor, that she has qualified immunity against liability for Howard's civil rights claims, because there was no violation of a clearly established constitutional right.  They correctly identify the right in question as the Howard's Fourth Amendment right to be free from unlawful searches and seizures, and state that Howards can make no case for such a violation.

A review of the relevant cases in many circuits, reveals a tacit (and incorrect) assumption on the part of child protective services agencies country-wide that there is a "DSS exception" to the Fourth Amendment to the United States Constitution.[3]  As set forth in the footnote below, a number of circuits have explicitly held that the Fourth Amendment does indeed apply to social workers and their adjuncts.  The facts in these and other cases that made it to the circuit level, reveal squalid tales of social service agencies out of control, anxious to protect themselves from liability for their over-zealous employees who imagine abuse behind every closed door.  These cases, and many others not cited, show that the agencies have attempted to create, in effect, a "No-4th Amendment- Zone" around their activities, ostensibly in the interest of protecting children.  They even argue, as here, (Def. Memo, P. 15) that no constitutional interest is at stake when a mandated reporter comes to the home.

Most parents, speaking intuitively, would view the entrance of a government agent who

---

[3] See *Hurlman v. Rice*, 927 F.2d 74 (2nd Cir. 1991); *Good v. Dauphin County Social Services*, 891 F.2d 1097 (3rd Cir. 1989); *Wallace v. Batavia School Distr. 101*, 68 F.3rd 1010 (7th Cir. 1995); *Calabretta v. Floyd*, 189 F. 3rd 808 (9th Cir. 1999); *J.B. v. Washington County*, 127 F. 3rd 919 (10th Cir. 1997);

has the power to potentially removal their children, or to easily get others to do so, such as Hajjar, as an enormous risk to their liberty! In all but the most serious criminal cases, DSS removal of children is a far greater impingement on the family's liberty than the disrespect of constitutional protections by law enforcement.

Many children do not come back from their interment at DSS. Others are molested, abused, starved, and ill-treated. For example, in Massachusetts, a child is five times more likely to be maltreated or injured in foster care, than in his own home.[4] Small children are dreadfully traumatized, not understanding why they cannot see their parents. The pathos is heart-rending, but it often gets reduced to some abstruse legal analysis, hermetically sealed from the teary faces of the children they are supposedly trying to protect, but end up betraying, by giving immunity to callous and even malevolent DSS operatives. A great liberty interest is at stake, which immunity cases have tended to trivialize, while forgetting that the child protection laws were supposed to be about protecting children, and re-uniting families.[5] All too often, the protection they need the most, is protection from the child protectors themselves.

Here, nurse Hajjar threw herself into this assignment with clinical efficiency, concluding, as a *de facto* extension of DSS, that the agency should rescue this family, whether they wanted

---

[4] "Child Welfare Outcomes 2000: Annual Report", from Administration for Children and Families, United States Department of Health and Human Services, Chapter IV - State Data Compare Massachusetts Context Data Chart "B" and Massachusetts Outcomes Data, Chart 2.

[5] ALM GL ch. 119, § 1  Policy of Commonwealth:   It is hereby declared to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development.

Case 1:02-cv-12106-WGY   Document 74   Filed 05/12/04   Page 17 of 20

to be rescued or not. She made no appointment, demanded to be allowed entry over the objection of Mrs. Howard, and proceeded to misrepresent her true reason for visiting, i.e. "To do paperwork". See answer to Interrogatory No. 4. Hajjar also usurped the parental permission on behalf of Howard's daughter, stating falsely that no parent was available to sign.

However, Hajjar is entirely too cavalier about the human consequences of her rush to get the Howard children away from their parents. As set forth in the complaint, the children were injured, wounded, mistreated, coerced to lie, and one died on her first birthday without her parents. That is the human cost of treating her own clients like enemies, and gleefully running to enlist and embrace those who injured them. In this context, courts need to be less punctilious about protecting the government from families, and start protecting families from government invasion. In the First Circuit, one looks warily for the Court who will begin to default to those who have no power against this giant child protection/social worker/industrial complex. Finding precedent seems to triumph over finding justice for these little ones. Should the children of the First Circuit suffer because its courts have not protected their rights against government as fully as the 9th, or other circuits cited *infra*.

In the First Circuit, the Court has laid out the test for determining whether qualified immunity is available to a particular defendant at a particular time. See *Hatch v. Dep't for Children, Youth and Their Families*, 274 F.3d 12, 19 (1st Cir. 2001). Under *Hatch*, it requires a trifurcated inquiry. An appellate court asks, first, whether a plaintiff alleges the violation of a constitutional right. If so, then the court asks whether the contours of the right are sufficiently established at the time of the alleged violation. Finally, the court asks whether an objectively reasonable official would have believed that the action taken or omitted violated that right. The

court makes these three inquiries in sequence, mindful that a single negative answer suffices to defeat a plaintiff's claim for damages. *Hatch* at 19.

Plaintiffs allege that the defendant Hajjar violated their Fourth Amendment rights, that the plain language of the Amendment states that a person's home is protected from entry by agents of the government without a warrant or permission, and that she could have known that her entry violated that right.

In this circuit, no appellate case has tested the boundaries of the Fourth Amendment on this matter, but that does not vitiate the Amendment, or the foundation of Howard's argument. The text of the Fourth Amendment is not inoperative just because a court has not yet addressed an attack on it.

It should be evident that a warrantless home entry by a government agent, over objection, violates the Fourth Amendment. Hajjar cites *Donald M v. Matava*, 668 F. Supp. 703 (D.Mass. 1987), and cases quoted therein, for the proposition that there is no clearly established right to be free of warrantless social worker intrusions into homes. This case concluded that the right was "undecided" vis-a-vis social workers. *Donald M.* at 709. However, this begs the question of whether it requires a court case to establish the clear proscriptions of the Fourth Amendment for every different government agency, before they can know that they cannot enter a home without a warrant. There is nothing in the text of the Amendment which limits it to one particular kind of government official. These attempts to do so, such as that of *Donald M.*, are almost always on the basis of "necessity,"[6] with the stated goal to protect children. But, as stated

---

[6] "Necessity is the plea of every infringement of human freedom. It is the argument of tyrants; It is the creed of slaves." - William Pitt, British Prime Minister, November 18, 1783.

above, there is no "DSS exception" to the Fourth Amendment. The Howard case shows why.

The Ninth Circuit has analyzed this issue at some length, and has found no DSS exception in the Fourth Amendment, holding that its protections do indeed apply to home invasions by government social workers and their adjuncts. See *Calabretta v. Floyd*, 189 F. 3rd 808 (9th Cir. 1999). In that case, the Court rejects the Massachusetts interpretation of *Wyman v. James*, 400 U.S. 309 (1971) cited in Hajjar's memorandum, which does not apply Fourth Amendment standards to social workers. *Calabretta* at 9866. Rather, it held that there does not have to be specific binding precedent for a particular class of government agent in order "to show that a right is clearly established for qualified immunity purposes," *Id.* at 9859, concluding that "any government official can be held to know that their office does not give them an unrestricted right to enter people's homes at will. *Id.* at 9860. The opinion is ambiguous, showing that Fourth Amendment protections are clear and well established.

If the Court finds that Nurse Hajjar was acting as a "state actor", per Section 1 above, then the plain text of the Fourth Amendment, untortured by political agendas or notions of necessity, vitiates her asserted qualified immunity, and makes her liable to the Howards for the damage she caused to them.

|  | Respectfully submitted,<br>The Plaintiffs,<br>By counsel, |
|---|---|
|  | /s/ Gregory A. Hession |
| Dated: May 12, 2004 | Gregory A. Hession BBO 564457<br>Rebecca L. Gietman BBO 645176<br>99 Forest Park Avenue<br>Springfield, MA 01108<br>(413) 746-3333 |

**Certificate of Service**

I, Gregory A. Hession, counsel for plaintiffs, have served the foregoing paper to all counsel of record, namely, Peter F. Russell, Asst. Attorney General, 200 Portland Street, Boston, MA 02114, and to Tory Wiegand, Morrison, Hahoney & Miller, 250 Summer Street, Boston, MA 02110, via first class mail, on May 12, 2004

                                            /s/ Gregory A. Hession
                                            Gregory A. Hession